The State v. Boyd.

---

No. 23,117.

THE STATE OF KANSAS, *Appellee,* v. PARK BOYD, *Appellant.*

SYLLABUS BY THE COURT.

CRIMINAL LAW—*Assault With Intent to Kill—Conviction—No Prejudicial Error Appears in the Record*   The information charged assault with a deadly weapon with intent to kill, and not merely a threatened attempt.   Certain evidence relating to the conduct of the defendant preceding and following commission of the offense, was properly admitted.   No prejudicial error was committed in giving and refusing instructions.   A motion for a new trial, on the ground of newly discovered evidence, was properly denied.   Assignments of error relating to other matters are without substantial merit.

Appeal from Wilson district court; SHELBY C. BROWN, judge. Opinion filed May 7, 1921.   Affirmed.

*Thomas E. Wagstaff,* of Independence, *and J. L. Stryker,* of Fredonia, for the appellant.

*Richard J. Hopkins,* attorney-general, *B. M. Dunham,* county attorney, and *W. H. Edmundson,* city attorney, for the appellee.

The State v. Boyd.

The opinion of the court was delivered by

BURCH, J.: The defendant was convicted of assault with intent to kill, and appeals.

On July 7, 1919, the defendant was driving his automobile at an unlawful rate of speed about the streets of the city of Fredonia. The defendant was a stranger to the city marshal, and the officer, in a polite and respectful manner, called the defendant's attention to the speed limit. The defendant said he would observe it, but immediately proceeded to violate it, and the marshal undertook to speak to him again by telephoning to his residence. The defendant denied he was the person with whom the marshal had conversed, became enraged, and the marshal discontinued the telephone conversation. The marshal then decided he would go to the defendant's residence and talk with him. While on his way, the marshal saw the defendant driving, bareheaded, in the direction of the city hall, and himself returned to the city hall in a Mr. Benefield's automobile. The marshal's account of what then occurred follows:

"I had my star here, and started across to him, and showed him I was city marshal. He says, 'Yes, I want to see you, too.' And we started across to the city building. Of course I can't recall everything that was said by either of us, but when we got over in front of the city building he wanted me to go in and prefer my charges against him, and I told him the city commissioners were in session, he would have to go before the police judge; and he told me again, and I says, 'I don't take orders from you.' I says, 'You can't tell me what to do.' He says, 'If you don't go in and prefer charges against me I will blow your damn head off,' and immediately put both hands on his hips.

"I grabbed his wrists, and in the struggle—I didn't know if he had a gun or not—but in the struggle, when he went down, there was a gun in his right hand. I turned his left hand loose and kept hold of his wrist with my left hand and ahold of the gun, this way, and ahold of the gun with the right, to keep it away from me. And we scuffled there a little while, and Mr. Spencer came, and Mr. Spencer took hold of his left hand, and told him to drop the gun. He says, 'I won't do it.' And Mr. Spencer says, 'If you don't I will twist your arm off,' and he—I don't know what he done, but anyway he loosened up on the gun; and I had the gun then, and I don't remember who I gave the gun to, whether to Mr. Spencer or Mr. Brewster, but when he got up he was—he says 'You won't live till morning.' I made some remark to him, I don't know what, and we took him back and put him in the jail. He says, 'You won't live the week out,' and he made some remarks, and I went off and left him.

"Q. What was the character of his language? A. Well, he was curs-

The State v. Boyd.

ing, and seemed to be in a rage all of the time. It has always been a puzzle to me.

"Q. What was his appearance after your getting out of the Benefield car? A. Well, he was just simply—looked like a wild man, almost."

Spencer testified as follows:

"Mr. Coats told him that he couldn't tell him what to do, that he wouldn't take orders from him, or something of the kind, he says, Mr. Coats says, 'No, I will not,' and he says, 'I will blow your damned head off,' and throwed both hands back to his hip, and I run across, and when I got there both gentlemen were on their knees, but I didn't see the gun drawn. . . .

"When I got to them I immediately grabbed Mr. Boyd by the left hand and twisted his arm, and told him to drop the gun, and he didn't do it for a second or two, and I gave him considerable of a twist. He was talking all the time, and cursing and mumbling and gritting his teeth, as though he did all he could to keep from dropping the gun, and I was twisting his arm all the time. (Objected to.) I finally twisted his arm and threw it across my knee and told him if he didn't drop the gun I would break his arm. He says, 'All right, I will drop it,' or 'I will,' or something. As soon as he dropped the gun he got on his feet. Mr. Coats handed me the gun and I kept it awhile, and Mr. Boyd raised his hands over his head and attempted to say things to Mr. Coats, but found it very difficult to talk. He stood there shaking his hands and trying to curse and talk, and finally managed to say, 'You will not live until morning,' or 'I will kill you before morning,' or something to that effect, or 'You will not live until morning.' Mr. Coats says, 'If I don't, I will die trying to do my duty, then.' And at that point the sheriff came up, and together they took Mr. Boyd into the city building. I followed right behind them carrying the gun, and after they had put Mr. Boyd behind—in the jail part, he again told Mr. Coats he would kill him, or words to that effect, he would kill him as soon as he got out."

The assignments of error are numerous, but they are so unsubstantial it is difficult to find anything with which to construct a judicial opinion of any value.

The defendant waived a preliminary examination, and an information was filed which omitted an essential allegation. An amended information was filed long before the trial occurred. It is said the defendant should have been given a preliminary examination for the offense stated in the amended information. There are two answers. The record does not disclose that the subject was brought to the attention of the trial court, and if it had been, the contention would have been unsound.

In the instructions to the jury and in the verdict the "information" was referred to, and it is contended that, since the "information" was confessedly defective, the defendant has not

had a trial such as the law guarantees. The contention is paltry.

It is said the court erred in overruling the defendant's motion to quash the information. There is no motion to quash in the abstract, and presumably the one filed was without merit. One subject is discussed as if embraced in the motion to quash. The amended information charged a willful and malicious assault with a deadly weapon with intent to kill the marshal "by threatening and attempting to shoot and kill the said Simon Coats, with a small gun," etc. It is said nothing but a threatened attempt was charged. Instead of that, the extent to which the assault proceeded was described, and not only was Coats threatened with a loaded revolver, but accomplishment of the intended killing was entered upon.

The defendant waived arraignment, and pleaded not guilty, and those features of the proceeding are not assigned as error. It is said, however, that the defendant should have been discharged on the county attorney's opening statement to the jury. In his opening statement the county attorney read the amended information, and he made no admission which destroyed the state's case.

It is said in effect the evidence should have been limited to what was said and done at the city hall entrance. All the incidents which led to the meeting at the city hall entrance were explanatory of the defendant's conduct and intention during the meeting. The city prison was in the rear portion of the city building. The defendant was taken directly to the prison as soon as he was overpowered. Evidence not quoted was that he was cursing Mr. Coats, calling him vile names, and threatening to kill him, continuously until after he was incarcerated. Apparently the defendant did not consider the incident as closed, and his language indicated persistence of the frame of mind he was in when he drew his revolver. His appearance was a proper subject of inquiry, and was appropriately described, and it did not constitute prejudicial error to permit the marshal to say that when he saw the defendant in the evening after his arrest, his appearance was normal.

An instruction to the jury authorized it to determine intent from the defendant's actions, whatever they were, in the matter of the alleged perpetration of the offense complained of.

It is said that under this instruction the jury was permitted to consider, to the defendant's prejudice, his violation of the state and city speed laws. Violation of those laws was not complained of. It is said further that the instruction permitted the jury to consider the defendant's maudlin statements, excitement, and wild condition—which is to say, to consider the evidence.

The court properly instructed the jury that all men are presumed to be sane until the contrary appears; and a requested instruction that the verdict should be "not guilty" if the defendant, at the time of the assault, was suffering from "any disability" which deprived him of rational thought and action, was properly refused. If the defendant's mental state were brought about by drugs, voluntarily taken, the same rule would apply as in cases of drunkenness.

Instructions relating to degrees of crime inferior to that of assault with intent to kill, are not now important. However, the instructions given relating to inferior degrees were in proper form, and were not confusing.

The defendant submitted the following definition of the word "assault," which was not given:

"You are instructed that the word assault as used in the information is a legal term, and is defined as an attempt or offer, with force or violence, to do a corporal hurt to another, whether from malice or wantonness, under such circumstances as denote at the time an intention to do it, coupled with a present ability to carry such intention into effect."

The lowest grade of offense submitted to the jury was assault and battery, and no complaint is made of the instruction given on that subject. There was no request for an instruction permitting the defendant to be found guilty of simple assault only. Whether or not the evidence warranted such an instruction is not now important, because giving it was waived. The defendant did not testify, and assault was proved beyond all doubt. The only debatable matter was intent, and the evidence clearly disclosed existence of felonious intent. The defendant made a peremptory demand, which was to be complied with or the marshal was to be killed, and made ready to execute his intention by drawing his revolver from his pocket. The marshal did not comply with the demand, and prudently took quick action to protect himself from the con-

sequences of noncompliance. If the defendant had then de-
sisted, this case would not be here. He did not desist, but con-
tinued to demonstrate his intention by use of physical force.
Under these circumstances, the proposed technical definition
of assault, or any technical definition of the term, could not
have been of the slightest assistance to the jury.

The defendant requested an instruction that an assault can
not be committed unless the person committing it has pres-
ent power and ability to commit it. According to the defend-
ant's own definition of assault, the instruction was bad. The
defendant requested several instructions framed on the theory
that, if the marshal was able, by himself or with the help of
others, to prevent discharge of the weapon, and was not in-
jured, then nothing wrong happened, and the defendant should
be acquitted. The requests were properly denied.

A long instruction relating to self-defense was tendered
which, however, was properly qualified as follows: "providing
the defendant had not first assaulted the said Simon Coats,
and thereby brought the threatened danger upon himself."
The first sentence of the proviso was the only part of the in-
struction which could be referred to the evidence, and the in-
struction was properly refused.

In support of the motion for a new trial, an affidavit was
filed stating that after the trial it was discovered the defend-
ant was addicted to the use of chloral to such an extent that
he was irresponsible. The affidavit was supported by deposi-
tions, which failed to show that the addiction existed on July
7, 1919, and there was no proof that the defendant's condition,
whatever it was, either on July 7 or at the time of the trial on
November 10, could not have been disclosed to the court at
the trial.

An argument that the court should have stopped the trial as
soon as the marshal gave his testimony, and should have re-
manded the defendant to the probate court for examination
for feeble-mindedness, is frivolous. Other contentions of the
defendant are not deemed to be of sufficient importance to re-
quire a reversal.

The judgment of the district court is affirmed.